# UNITED STATES DISTRICT COURT

Northern District of Indiana
South Bend Division

| | | |
|---|---|---|
| ACC CLIMATE CONTROL and ALEX MOULTANOVSKY, | ) ) | |
| Plaintiffs, | ) | |
| | ) | CASE NO.: 3:07-cv-125 TLS-CAN |
| v. | ) | |
| | ) | |
| BERGSTROM, INC., | ) | **JURY TRIAL DEMANDED** |
| Defendant. | | |

# AMENDED COMPLAINT

Plaintiff, ACC Climate Control ("ACC") and Mr. Alex Moultanovsky ("Moultanovsky"), for their Amended Complaint against Defendant, Bergstrom, Inc. ("Bergstrom"), hereby allege and state:

**JURISDICTION and VENUE:**

1. ACC is a corporation organized under the laws of the State of Indiana, having a primary place of business at 22428 Elkhart East Blvd., Elkhart, Indiana 46514.

2. Moultanovsky is an individual residing at 1530 Rockwood Lane, Mishawaka, IN.

3. Bergstrom is a corporation organized under the laws of the State of Illinois, having a primary place of business at 2390 Blackhawk Road, Rockford, Illinois 61125.

4.  This action involves claims arising under the patent laws of the United States (including Title 35, United States Code §101, et seq.), the copyright laws of the United States (including Title 17, United States Code §101, et seq.), under the antitrust laws of the United States (including Title 15, United States Code §2, et seq.), and under laws of the State of Indiana relating to unfair competition, abuse of process, and intentional interference with contractual relations.

5.  This Court has jurisdiction over the subject matter of the claims pursuant to 28 U.S.C. §§1331, 1332, 1338(a), and 1367(a).

6.  Bergstrom has regularly conducted business within this judicial district and has repeatedly threatened to bring legal action against a resident of this judicial district, ACC, by sending letters to ACC in this judicial district.  Further, Bergstrom has actually filed claims against ACC and Moultanovsky in this judicial district.  A substantial part of the events giving rise to both ACC's and Moultanovsky's claims against Bergstrom arose in this judicial district.  Accordingly, venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

**SUMMARY OF THE CLAIMS:**

7.  ACC is bringing the following claims against Bergstrom:

    a.  for declaratory judgment that U.S. Patents 6,276,161 (the '161 patent) and 6,889,762 (the '762 patent) and all continuation patents based thereon, including U.S. Patents 7,454,922 (the '922 patent) and 7,448,227 (the '227 patent) and any patents issuing upon patent application serial nos. 11/322,006 (the '006 case) and 11/088,441 (the '441 case) are:

I.  Invalid under 35 U.S.C. §§101, 102, 103, and 112,

ii.  Not Infringed by the TropiCool system or any other product made by ACC,

iii.  Not enforceable by Bergstrom on account of inequitable conduct by Bergstrom in proceedings before the United States Patent and Trademark Office ("USPTO"),

b.  for violation of the antitrust laws of the United States (including the Sherman Act) by Bergstrom in illegally attempting to monopolize the trade in interstate commerce for aftermarket no-idle heating and air conditioning systems in Class 8 trucks and thereby causing damage to ACC, and

c.  for unfair competition in the business of selling aftermarket no-idle heating and air conditioning systems for Class 8 trucks by Bergstrom's wrongful business practices and abuse of the legal process which have caused damage to ACC.


8.  ACC and Moultanovsky are each bringing the following claims against Bergstrom:

a. for declaratory judgement that Copyright Registration TXu.-1-360-686 (Exhibit 7 to the Amended Counterclaims in this case, docket #30-6) obtained by Bergstrom is:

I.  Invalid under 17 U.S.C. §102 for failure to possess sufficient originality and under 17 U.S.C. §409(9) for failure to identity of pre-existing work upon which the copyrighted material "was based on or incorporates,"

ii. Not infringed by ACC or Moultanovsky,

iii. Not enforceable on account of inequitable conduct by Bergstrom in proceedings before the United States Copyright Office ("Copyright Office"),

3

and

    b.   for intentional interference in the contractual relations between ACC and Moultanovsky on account of the sham litigation commenced by Bergstrom against Moultanovsky.

9.  Moultanovsky is bringing the following claim against Bergstrom:

    a.  for abuse of process on account of the sham litigation commenced by Bergstrom against Moultanovsky.

**FACTS SUPPORTING THE CLAIMS**:

<u>As to declaratory judgement ripeness:</u>

10.  Prior to the commencement of litigation in this case, the USPTO issued the '161 and '762 patents to Bergstrom, each generally relating to air conditioning systems for motor vehicles. At that time, Bergstrom had also filed at least four other patent applications which were still pending and which also generally related to air conditioning systems for motor vehicles.  At present, Bergstrom has filed at least six patent applications claiming priority from the '762 patent application. There are also at least two other patent applications sharing continuity with the '161 patent application.

11. Prior to commencement of litigation in this case, Bergstrom asserted that certain of ACC's products, particularly its TropiCool Power Plus system for "No-Idle" cooling of motor vehicles, infringes upon the '161 and '762 patents and will infringe upon at least four pending patent

4

applications when those patents issue.

13. The '161 and '762 patents and the pending patent applications included a large number of patent claims. At least some of those patent claims are not infringed by ACC. After being informed of Bergstrom's accusation, ACC sought to analyze the merit of that accusation and communicated with Bergstrom in that regard. However, despite repeated requests for identification of which of the many patent claims Bergstrom contended were infringed, Bergstrom refused to so inform ACC prior to and even for months after this litigation began.

14. By its refusal to cooperate in good faith with ACC's requests to understand and identify and scope of the patent claims being asserted, Bergstrom intended to cause ACC to have uncertainty and increased costs in resolving this dispute. Bergstrom intended that ACC's uncertainty and costs in that regard would deter ACC from remaining in the market for no-idle products. Bergstrom's actions in that regard have caused ACC to limit its production of no-idle products until this litigation is resolved.

15. Prior to commencement of litigation in this case, Bergstrom repeatedly threatened to sue ACC for that patent infringement and to enjoin ACC's sale of its products and to collect substantial money damages from ACC. After commencement of litigation in this case, Bergstrom asserted counterclaims for infringement of the '161 and '762 patents and sought to enjoin ACC's sale of its products and to collect substantial money damages from ACC.

16.  ACC's accused products do not infringe upon those patents.  ACC has explained to Bergstrom in detail why Bergstrom is in error in its infringement accusations.  However, Bergstrom has not withdrawn its accusations, and ACC has the definite and firm belief that Bergstrom will continue to make those accusations to the detriment of ACC's marketing efforts and to disrupt ACC's sales of the accused products.

17.  The USPO erroneously issued those patents to Bergstrom, omitting full and proper consideration of relevant prior art and lacking sufficient specificity, especially in light of the ordinary level of skill in the art, because of Bergstrom's failure to comply with the patent laws and because of Bergstrom's intentional misrepresentations to the USPTO.

18.  Bergstrom has accused ACC and Moultanovsky of infringing upon its copyright in a document entitled Bergstrom Testing Standard, Copyright Registration No. TXu. 1-360-686, and has brought a claim for that infringement in this Court.

19.  Contrary to Bergstrom's claim, ACC and Bergstrom have not reproduced the allegedly copyrighted work and distributed such copies to the public.  ACC and Bergstrom have explained to Bergstrom that they have not done this and that, in fact, the Society of Automotive Engineers ("SAE") event which Bergstrom thought was the basis of its copyright claim was actually conducted by another Bergstrom employee at the direction of Bergstrom several years earlier.  However, Bergstrom has not withdrawn its copyright claim and ACC and Moultanovsky have the definite and firm belief that Bergstrom will continue to make that claim to the detriment of ACC's and

Moultanovsky's financial interests.

20. The Copyright Office erroneously issued that copyright registration to Bergstrom because of Bergstrom's failure to comply with the copyright laws and because of Bergstrom's intentional misrepresentations to the Copyright Office.

21. Bergstrom's actions put ACC's financial interests, marketing efforts, and sales of the accused products at substantial risk of litigation. ACC desires a resolution of this dispute so that it can know for certain what products it can market without risk of patent infringement liability. Similarly, Bergstrom has put Moultanovksy's financial interests at substantial risk of litigation, and Moultanovsky desires a resolution of this dispute so that his potential liabilities can be determined.

22. Accordingly, a case of actual controversy exists between the parties and within the jurisdiction of this Court that is now ripe for a declaration of the rights of the parties by this Court under 28 U.S.C. §2201.

<u>As to Patent Invalidity under 35 U.S.C. §101:</u>

23. Assuming that there is in fact any patentable invention in the disclosure of the '161 patent in light of the true nature of the prior art, Mr. Zeigler and Mr. Guo are not co-inventors with Mr. Peiffer on the '161 patent or its parent case. There was no "co-inventorship" among those persons within the meaning of the patent laws. Mr. Guo made no contribution whatsoever to the invention claimed in the '161 patent. Mr. Zeigler's involvement was only to review the invention

disclosure created by Mr. Peiffer and then to approve the filing of patent applications based thereon.

24.   This error in inventorship designation on the application for the '161 patent and its parent case, U.S. Patent 6,038,877, was not made without deceptive intent.  In fact, Bergstrom knew that Mr. Peiffer was retiring at that point in time or soon after and that it intended to assert the patent against others as part of its extensive NITE system patent portfolio.  Bergstrom wanted the name of Mr. Guo on the patent primarily because he was an officer of the corporation and would likely be available to testify about the invention generally if it needed him to in litigation.  Bergstrom wanted Mr. Zeigler's name on the patent primarily because he was its Chief Engineer and would likely be available to testify, if it needed him to, about the invention in context of the NITE system in litigation.  Each of these inventors knew that the declaration of inventorship, which they executed to support the patent applications under penalties of perjury, was false in that regard, but each executed the declaration nonetheless when Bergstrom requested them to do so.  In the case of Mr. Guo and Mr. Zeigler, the false execution was done for personal financial gain because of their elevated positions within Bergstrom.  In the case of Mr. Peiffer, the false execution was done because of misguided employee loyalty.

25.   Assuming that there is in fact any patentable invention in the disclosure of the '762 patent in light of the true nature of the prior art, the designation of inventors on the '762 patent and the cases claiming priority and continuity therewith is false for incompleteness.  Depending upon the subject matter of the particular patent claims, engineers at Glacier Bay and Tecumseh/Masterflux are the actual or at the least co-inventors of the claimed invention.  The key to patentability of the

'762 patent, assuming that it is patentable, is the controller for the compressor and the programming for that controller. However, employees of Glacier Bay and/or Tecumseh/Masterflux created at least one of those controllers and its programming. Mr. Elias created only the other controller and its programming. Both controllers are necessary for the system claimed in the '762 to perform its claimed function.

26. This error in inventorship designation on the application for the '762 patent and its subsequent related patent applications was not made without deceptive intent. Bergstrom purchased one of the Glacier Bay compressors on or about August 7, 2001 and tested it for use in the NITE system prior to completing the invention for which the '762 patent application was filed. Afterwards, Bergstrom hired and worked with Tecumseh/Masterflux for the purpose of buying custom made controllers, complete with programming, for the use in the NITE system. Bergstrom omitted identification of the co-inventors for at least two reasons. First, Bergstrom intentionally concealed the existence of the second controller from the patent disclosure so as to impede the production of competing products. Disclosure of proper inventorship on the patent would instead require an enabling disclosure for those skilled in the art. Second, Bergstrom intended to assert its NITE system patent portfolio against potential competitors and wanted to control the range of potential witnesses in the event that litigation became necessary.

27. The inventorship designation of the subsequent related patent applications to the '762 patent is false for another reason. During prosecution of those later patent applications, patent claims were asserted to the USPTO for inventions which were not conceived of by either Mr. Elias or Mr.

Zeigler at the time the application for the '762 patent application was filed.  Instead, Bergstrom examined the products of its competitors which came to market after the invention of the '762 patent and then crafted patent claims to cover those products as well.  In doing so, Bergstrom expanded the scope of the claims to cover both subsequent inventions of others and/or prior art inventions of others.  An example of which is Claim 1 of the '006 case:

> "A method of operating a vehicle air conditioning system, the vehicle having an engine, to provide engine on and engine off operation, comprising the steps of:
>
> operating the air conditioning system at a first capacity when the engine is running; and
>
> operating the air conditioning system at a second capacity when the engine is not running.

28.  Claim 1 of the '006 case is "anticipated" with the meaning of the patent laws by an entire well known class of products for Class 8 trucks, called APUs (auxiliary power units).  Claim 1 is prima facie invalid under 37 CFR§1.56(b).  Mr. Zeigler was well aware of such APUs prior to the invention claimed by the '762 patent.  Mr. Zeigler was conscious of such APUs, and actually marketed the NITE system against APUs, during the prosecution of the '762 patent and the subsequent related patent applications.  Mr. Zeigler personally participated in the decision to omit proper inventorship designation from those patent applications and shared Bergstrom's intent to conceal inventorship information so as to obtain financial gain.

As to Patent Invalidity under 35 U.S.C. §§102 and 103:

29.  During prosecution of the patent applications, the USPTO was not aware of certain prior art which was material to the patentability of the inventions claimed in the '161 and '762 patents and in at least some of the related patent applications.  Such prior art includes at least:

a.  The 1996 and 1990 DARPA reports describing heating and air conditioning systems in electric automobiles which used variable speed compressors and intelligent power management controllers which altered the compressor speed as battery voltage decreased. Bergstrom was made aware of these reports by Glacier Bay in 2001.

b.  The Sierra model compressor of Glacier Bay which Bergstrom purchased for testing on or about August 7, 2001 (in this regard ACC references also the allegations made by Glacier Bay in its Amended Counterclaims of *Bergstrom, Inc. v. Glacier Bay, Inc.* Case No. 3:08-cv-50078 before the U.S. District Court for the Northern District of Illinois, Western Division, and incorporated herein those allegations as to prior art and Bergstrom's actions, to the extent not already stated herein).

c.  The variable speed compressor controllers and programming made and sold by Tecumseh/Masterflux to Bergstrom and others.

d.  The Delphi heating and air conditioning system testified to by Mr. Ghodbane in this lawsuit.

e.  A variety of heating and air conditioning systems widely known in the housing and building markets and also known to Mr. Zeigler which perform essentially the same functions as the inventions claimed by Bergstrom in the '762 patent.

f.  Prior Bergstrom heating and air conditioning systems having fixed tubing with permanent connections, such as the Standard Core Blend Module of Exhibit 29 testified to

by Mr. Zeigler in this lawsuit.

g.   A wide variety of truck adaptations of electrical, refrigeration, heating, and appliance products from the housing and building markets which had been readily made to fit and operating in trucks and other vehicles and which were well known to Mr. ZEIGLER and others at Bergstrom.

h.   The inherent function of well-known controllers for variable speed motors and compressors to alter speeds as voltage changes.

30.   The USPTO was not aware of the level of ordinary skill in the art of heating and air conditioning systems for Class 8 trucks.  Bergstrom had information in that regard which it did not supply to the USPTO, including, for example, the significant extent of experimentation needed to created the programming for the controllers of the '762 patent, and the extent to which those skilled in the art had already relied upon products from the housing and building markets when designing products for Class 8 trucks.

31.   If the USPTO had known of the true scope and content of the prior art as well as the true level of ordinary skill in the art, it would not have allowed the claims of the '161 or '762 patents.

32.   The '161 and '762 patents and the patents based upon the same disclosure as those two patents are invalid under 35 U.S.C. §102(a), (b), and (f) since the inventions claimed by those patent were anticipated by the prior art, including the prior art of Bergstrom and others and does not meet the conditions of patentability.  Those inventions were known and used by others in this country

12

before the "invention" thereof by the Bergstrom.  Those inventions were described in printed publications, in public use, and on sale in this country more than a year prior to the date of the applications for patent in the United States by Bergstrom.  Moreover, the named inventors did not themselves invent the subject matter claimed in the '161 and '762 patents.

33.  The '161 and '762 patents and the patents based upon the same disclosure as those two patents are invalid under 35 U.S.C. §103, since even if the "invention" is not identically disclosed or described as set forth in 35 U.S.C. §102, the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the "invention" was made to a person having ordinary skill in the art of creating heating and air conditioning systems for Class 8 trucks.  The improvement suggested by Bergstrom for the "161 and 762 patents was no more than the predictable use of prior art elements according to their established functions.  *KSR Int'l. v. Teleflex, Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed 2d 705 (2007).

As to Patent Invalidity under 35 U.S.C. §112:

34.  The '762 patent is not "enabling" within the meaning of the patent laws since, for example, it fails to disclose that in fact a second controller is needed to operate the air conditioning system as claimed.  As a further example, the '762 patent is not enabling within the meaning of the patent laws because someone of ordinary skill in the art of heating and air conditioning systems for Class 8 trucks could not created the programing needed to operate even the single controller described in that patent without undue, lengthy and substantial experimentation and additional research.  Bergstrom itself took a year to create the programming even using a skilled programmer

to assist those of ordinary skill in the relevant art.

35.   The '161 patent is not "enabling" within the meaning of the patent laws since, for example, it fails to  provide any definition of "fixed tubing" or "permanent connections" which is sufficient to enable to invention to perform the "no-leak function" argued to the USPTO by Bergstrom in the Amendment of December 11, 2000.  Bergstrom never built such a system which did not leak and indeed, as testified to by Mr. Von Driska in this case, it was impossible for Bergstrom to do so.  Since Bergstrom did not know how to do it, the patent disclosure was clearly not sufficient regardless of the assertions Bergstrom made to the USPTO that its invention had that capacity.

36.   The '762 patent was not validly issued in light of the requirements of 35 U.S.C. §112 (second paragraph), in that one or more of the patent claims do not particularly point out and distinctly claim the subject matter which the applicants regard as their invention.  Instead, for example, certain terms and phrases in the patent claims, such as "intelligent power generation management controller" and "modulate the speed" are made intentionally ambiguous so as to purport to encompass far more that was actually invented by Bergstrom.  Further, the patent claims are invalid under the "Missing Element" doctrine, as applied under §112, since they do not include the second controller element which is actually necessary for the invention to function.

37.   The '161 patent was not validly issued in light of the requirements of 35 U.S.C. §112 (second paragraph), in that one or more of the patent claims do not particularly point out and

distinctly claim the subject matter which the applicants regard as their invention.  Instead, for example, certain terms and phrases in the patent claims, such as "fixed tubing" and "permanent connections" are made intentionally ambiguous so as to purport to encompass far more that was actually invented by Bergstrom.

38.  The '762 patent does not disclose the "best mode contemplated by the inventor of carrying out his invention," as is required by law.  For example, Bergstrom failed to disclose that two separate controllers were actually preferred for use with that invention in order for it to most efficiently and cost effectively obtain its desired function.

39.  The '161 patent does not disclose the "best mode contemplated by the inventor of carrying out his invention," as is required by law.  For example, Bergstrom failed to disclose the modular box or package configuration preferred and intended for use by Bergstrom, as discussed by Mr.Zeigler in his deposition in this lawsuit.

As to Non-infringement of the Patents:

40.  The ACC products which are accused of infringement do not include each and every element of the claimed inventions or the functional equivalent of those elements.  For example, with respect to the '161 patent, ACC's accused products do not use fixed tubing having permanent connections.  Instead, ACC uses well known flexible tubing having adjustable connections to facilitate assembly, installation and maintenance.  With respect to the '762 patent, the ACC products do not modulate the speed of the compressor as the power supply voltage changes.  Instead, ACC

uses a fixed speed compressor and simply switches it on and off as needed.  Accordingly, the ACC products do not infringe any of the patents in issue.

41.  The Complaint did not indicate which of the patent claims in either of the '161 or '762 patents that ACC is considered to infringe.  Indeed, even when a list of affected patent claims was provided to ACC months later, that designation was only provisional and Bergstrom continued to assert infringement of the "submarine patents."  Accordingly, ACC was forced to specifically litigate herein against all of those claims at least for a significant period of time.  Under 35 U.S.C. §288 (second sentence), Bergstrom is not entitled to recover costs in this litigation even if it prevails on one or more of the claims of the '161 or '762 patent because one or more other claims of those patents are not valid and Bergstrom has filed no disclaimer of the invalid claims with the USPTO prior to commencing this lawsuit.

As to Fraud and Inequitable Conduct by Bergstrom before the USPO:

42.  Under 37 C.F.R. §1.56 Bergstrom, its attorneys before the USPTO, and each of the named inventors personally had "a duty of candor and good faith" to the USPTO and were required to disclose to the USPTO "all information known to" them which was material to the patentability of "each pending claim."  Neither Bergstrom nor the named inventors complied with this duty in connection with the '161 and 762 patents.  For example, on June 19, 2002 and August 22, 2003, Bergstrom filed Information Disclosure Statements with the USPTO in the '762 patent application which listed certain items, but Bergstrom expressly refused to admit to the USPTO that any of those patents was material to the patentability of any pending claim or even qualified as prior art, and

16

failed to ever identify any prior art to the USPTO which it considered to be material to the patentability of any claim, and especially failed to properly inform the USPTO of any of the unpatented prior art no-idle heating and air conditioning products for Class 8 trucks actually made and sold within the industry, despite having actual knowledge of frames which were material to the examination of its patent claims.

43.  In addition to the failings of ¶29 and 42, Bergstrom failed to disclose to the USPTO at least the following material information which Bergstrom was aware of:

a.  contrary to the representations made by its attorneys, Bergstrom was never able to make non-leaking connections of the type shown in the '161 patent,

b.  the true state of the prior art in relevant to the '161 patent, including with respect to fix tubing with permanent connections, the fact that portable refrigerators mounted in Class 8 trucks had that structure for the same purposes as the claimed invention, and that similar fixed tubing with permanent connections were commonly found in heating and air conditioning systems of houses and buildings,

c.  the true inventorship of both the '161 and '762 patents,

d.  the true level of ordinary skill in the relevant art of the '762 patent was contrary to the assertion made by Bergstrom's attorneys in the Amendment of October 11, 2004,

e. a person of ordinary skill in the art of heating and air conditioning systems for Class 8 Trucks could not created the programing needed to operate even the single controller described in that patent without undue, lengthy and substantial experimentation and additional research, and that Bergstrom itself took a year to create the programming even using a skilled programmer to assist those of ordinary skill in the relevant art,

17

f.  two controllers were needed to enable the invention of the '762 patent to function as contemplated by the named inventors,

g.  the arguments and evidence presented against Bergstrom by ACC in this litigation (instead, for example, Bergstrom disclosed in the continuation cases only the prior art documents themselves, but without ACC's analysis as presented in detail in various documents, including interrogatory answers), contrary to the express warnings of M.P.E.P. §2001.06(c)("material information arising from [related litigation] must be brought to the attention of the [USPTO].  Examples of such material information include evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of "fraud,""inequitable conduct" . . .), and

h.  with respect to the continuation cases, that Bergstrom was in facts seeking to claim a scope of invention which was not conceived of until after Bergstrom saw competing products on the market against it.

44.  The actions of Bergstrom referred to in ¶s 42 and 43 were made with the specific intent that the Patent Examiner rely upon the lack of material prior art references in the patent application record in making his decision to allow some or all of the original claims presented by Bergstrom.

45.  The Patent Examiners of the '161 and '762 patents were justified in relying upon a patent applicant to comply with its duty under 37 C.F.R. §1.56.  The Patent Examiners did in fact rely upon the lack of material prior art in the patent application records with regard to the subject matter of the patent claims of the '161 and '762 patents in making their decisions to allow those claims.

46.  The patent infringement claims of the present lawsuit against ACC could not have been brought by Bergstrom if the Patent Examiners had decided not to allow the claims of the '161 and '762 patents.

47.  The patent infringement claims of the present lawsuit against ACC has and will cause ACC to incur significant costs and expenses.

48.  The actions of Bergstrom referred to in ¶s 42 and 43 constitute "inequitable conduct" within the meaning of the Patent Laws.

54.  Accordingly, Bergstrom's fraudulent and inequitable conduct referred to in ¶s 42 and 43 has caused damage to ACC and warrants a finding both that this case is "exceptional" within the meaning of 35 U.S.C. §285 such that ACC should be awarded its reasonable attorneys' fees, *see*, *e.g.,  A.B. Chance Co. v. RTE Corp.*, 854 F. 2d 1307, 1312 (Fed. Cir. 1988)(inequitable conduct before the USPO can support an award of attorneys' fees)  and that Bergstrom is barred from enforcing the '161 and '762 patents and all patents based thereon under long established principles of equity and patent law, *see, e.g., Precision Instrument Mfg., Inc. v. Automotive Maintenance Mach., Co.,* 324 U.S. 806, 65 S. Ct. 933, 89 L. Ed. 1381 (1945)(traditional doctrine of "Unclean Hands" bars enforcement if patent obtained through fraud or inequitable conduct); *J.P. Stevens & Co., Inc., v. Lex Tex Ltd., Inc.*, 747 F. F2 1553, 1560-61 (Fed. Cir. 1984)(inequitable conduct with respect to any claim prevents enforceability of all claims of the patent - the so-called "All Claims Rule"), *cert. denied,* 474 U.S. 822 (1985).

<u>As to Violations of the U.S. Antitrust laws:</u>

55.   Both parties are in the business of making and selling no-idle heating and air conditioning systems for vehicles throughout the United States.   There are less than 25 known competitors in that market.   Both parties have created such systems which can be used as aftermarket products for the Class 8 truck market.   At present, Bergstrom has sold large numbers of such products, calling them its NITE system.   In contrast, ACC has sold very few of such products for the Class 8 truck market, pending the outcome of this litigation.   If not for the threat of patent infringement liability, ACC could now be in direct competition with Bergstrom for these products.

56.   Bergstrom is actively seeking to obtain a profusion of patents directed to no-idle heating and air conditioning systems for sale to the Class 8 truck aftermarket.   Bergstrom has asserted that the scope of its patent rights extends far beyond any inventions found in the NITE system. Bergstrom has accused every manufacturer of any viable no-idle heating and air conditioning system for sale to the Class 8 truck aftermarket of patent infringement, regardless of whether Bergstrom has actually examined those products or not.   Infringement of those no-idle products cannot be determined in good faith without examining the accused products.   Bergstrom has actually asserted claims of patent infringement in litigation against ACC and Glacier Bay, Inc., in two separate lawsuits.

57.   As a result of and through its patent infringement assertions and its demonstrated willingness to force its competitors through unwarranted litigation, Bergstrom has sought to coerce licenses from its competitors for no-idle heating and air conditioning systems for sale to the Class

20

8 truck aftermarket or to preclude competition from those, like ACC, who will not pay its licenses.

58.   There is a real and substantial market for no-idle heating and air conditioning systems for sale to the Class 8 truck aftermarket in the United States and other parts of the world.  This market can involve thousands of Class 8 trucks and millions of dollars of sales directly and indirectly.  These products can allow trucking companies to save thousands of dollars, significantly reduce air and noise pollution and maintain compliance with state and federal trucking laws. Bergstrom's attempts to coerce licenses and to restrict competition will likely result in higher prices and a lower supply of no-idle heating and air conditioning systems for sale to the Class 8 truck aftermarket.

59.   By assertion of its patent portfolio against competing manufacturers for no-idle heating and air conditioning systems for sale to the Class 8 truck aftermarket, Bergstrom has obtained dominance of that market and has the ability to monopolize or exert monopoly power in that market.

60.   The basis for Bergstrom's patent infringement claims are the disclosures of the '161 and '762 patents.  However, those patents and their continuation cases are not valid in light of the prior art and were obtained by Bergstrom in violation of law and through inequitable conduct by Bergstrom.

61.   The '161 and '762 patents and their continuation patents have colorable validity to manufacturers of no-idle heating and air conditioning systems for sale to the Class 8 truck

aftermarket due to Bergstrom's demonstrated willingness to enforce those patents through litigation.

62.  The '161 and '762 patents and their continuation patents have had a detrimental impact on the market for no-idle heating and air conditioning systems for sale to the Class 8 truck aftermarket by deterring and delaying competition and by increasing the costs of such products to customers and users.  In part, this is because competing manufacturers like ACC who have resisted Bergstrom have been forced to absorb litigation costs.

63.  Bergstrom has illegal monopoly power in the market for no-idle heating and air conditioning systems for sale to the Class 8 truck aftermarket or is dangerously close to achieving that through litigation intended to stop competition of the remaining competitors.  Bergstrom has obtained this power by willful violation of the patent laws and by anticompetit6ive and predatory acts against its competitors under color of law through attempted and threatened enforcement of baseless legal claims.  For example, in addition to the actions already mentioned herein, Bergstrom has:

     a.  conducted litigation in a dilatory and obstructive manner to preclude disclosure of evidence,

     b.  pursued sham and objectively baseless claims in litigation against individual employees of its competitors, such as those it has made against Moultanovsky, with the primary objectives of increasing the cost of litigation to its competitors, disrupting its competitor's business, and inflicting outrageous and needless emotional distress upon the individuals,

c.  intentionally withholding as a trade secret the operational software needed to enable use of the inventions disclosed and claimed in its patents, and

d.  publicizing baseless litigation against its competitors to customers in the relevant market in a manner calculated to injure those competitors regardless of the merits of the litigation.

64.  Bergstrom is and has been in violation of 15 U.S.C. §2, and ACC has standing to bring this action against it.  *See, e.g., Brunswick Corp. v. Reigel Textile Corp.*, 752 F. 2d 261, 265 (7th Cir. 1984).

As for Unfair Competition:

65.  Bergstrom has engaged is a series of wrongful business practices against ACC.  First, Bergstrom has brought patent infringement claims against ACC which Bergstrom knew or should have known were baseless on account of the invalidity of the patents and because ACC's products are clearly distinct from the claimed invention.  Second, Bergstrom has threatened and litigated its patent infringement claims in a manner which is calculated to conceal material information and evidence from ACC and to needlessly drive up the costs of litigation.  Third, when ACC refused to buckle under to Bergstrom's coercion with patent claims, Bergstrom asserted sham claims against ACC and a key employee of ACC, Moultanovsky, which Bergstrom knew were not founded in fact or which Bergstrom brought in reckless disregard of the facts in the hopes that ACC would incur substantial additional expenses directly and through the disruption of its business relations with Moultanovsky.  Details of that sham litigation are set forth in more detail below.

As to the Copyright Registration Issues:

66.    The copyright infringement claim which Bergstrom brought against ACC and Moultanovsky was objectively baseless and brought in bad faith.  The copyright infringement claim arose incident to a disclosure of the allegedly copyrighted material to SAE.  However, that event took place years ago, prior to Moultanovsky's employment by ACC, and was done at the instruction of Bergstrom by a different Bergstrom employee.  Specifically, Bergstrom wanted the SAE to adopt all or part of the testing standard set forth in that work as an industry standard.  Bergstrom instructed, allowed and/or encouraged its employee, John Ventimigila, to disclose this work to SAE for SAE's use in that regard.  Moultanvosky was aware of that disclosure to SAE because, for example, he was a member of SAE.  ACC had nothing at all to do with that disclosure to SAE and, indeed, did not even exist at that time.  Bergstrom brought this claim of copyright infringement either without any investigation into the facts or in complete disregard of the facts.  Bergstrom's motive in doing so was illegal and improper, as describe further above.  ACC and Moultanovsky did not infringe upon any such copyright of Bergstrom.


67.    In applying for the copyright registration in issue here, Bergstrom was required to disclose to the Copyright Office the "pre-exiting work or works that [the registered work] is based on or incorporates."  Bergstrom did not do so even though Bergstrom knew or should have known that the Testing Standard it was seeking to register was based upon pre-existing works, at least some of which were in the public domain.  If Bergstrom had complied with the copyright laws in that regard, the scope of the copyright could have been accurately determined.  It is likely that such compliance would have resulted in a denial of copyright registration for lack of sufficient originality.

24

Bergstrom is barred from enforcing any copyright infringement claim against ACC in the United States without having a corresponding copyright registration.  Bergstrom's actions in failing to disclose the pre-existing works was intentional and calculated to allow a colorable copyright claim to be used as a litigation tactic against ACC and Moultanovsky.

68.  Bergstrom's assertion of an invalid copyright registration and a baseless copyright infringement claim against ACC and Moultanovsky have caused ACC and Moultanovsky to incur significant expenses in defense of that claim.  That result was intended by Bergstrom regardless of the merits of the copyright infringement claim.

<u>As for Intentional Interference with Contractual Relations:</u>

69.  Previously, Bergstrom brought baseless litigation claims against a competitor who had employed a former Bergstrom employee.  As a result of the costs which would be associated with defending against even a baseless claim, that competitor terminated the employment of the former Bergstrom employee.  Thereafter, Bergstrom dismissed its claims against that competitor.

70. Moultanovsky is a former Bergstrom employee.  When Bergstrom's efforts against ACC with the patent infringement claims failed to coerce ACC out of the no-idle product market or to pay Bergstrom a license fee, Bergstrom brought several sham and baseless claims in this litigation against ACC and/or Moultanovsky with the intent that ACC terminate its relationship with Moultanovsky or accede to the patent license or stay out of the no-idle product market.

71. Moultanovsky and ACC have a contractual relationship. Assertion of the baseless claims in its Amended Counterclaims by Bergstrom against ACC and/or Moultanovsky has caused significant expense to ACC, has caused strain in the working relationship between ACC and Moultanovsky, has adversely affected the performance of the contractual relationship between ACC and Moultanovsky, and has resulted in lower productivity of ACC and Moultanovsky in the business of ACC's products. This has caused significant economic damage to both ACC and Moultanovsky. This damage was intentionally inflicted by Bergstrom as part of its attempted coercion.

At for Bergstrom's Abuse of Process against Moultanovsky:

72. In its Amended Counterclaims, Bergstrom asserted several claims against Moultanovsky whigh were not only baseless and totally without merit, but which were asserted not for the purposes of any bone fide claim of right, but rather to cause needless and intentional distress, distraction and expense upon Moultanovsky and his employer. Bergstrom did this as part of its attempts to coerce ACC through Moultanovsky, but also Mr. Von Driska, (Bergstrom's litigation manager for this lawsuit with ACC and designated witness undere Rule 30(b)(6)) a former associate of Moultanovsky when he was employed at Bergstrom, incited Bergstrom to do this to Moultanovsky as a matter of personal spite. Bergstrom was aware of the animosity which Mr. Von Driska has had toward Moultanovsky for many years. For Bergstrom to allow Mr. Von Driska to use this lawsuit for personal satisfaction is reckless and indifferent to Bergstrom's obligations to the legal process.

73. For example, Bergstrom has accused Moultanovsky of improperly using Bergstrom's email system to solicit employment elsewhere back in 2002 when Moultanovsky was an employee

26

of Bergstrom.  However, Bergstrom knew or should have known that Moultanovsky did so at the express suggestion and with the permission of Bergstrom's COO, Larry Bull, who wanted to expeditiously "out plaCe" Moultanovsky, preferably with one of Bergstrom's customers.

74.  Bergstrom accused Moultanovsky of taking and using trade secrets, such as the the information found in the documents filed under seal with this Court as Exhibit 3 to the Amended Counterclaims.  However, Bergstrom knew or should have known that the content of those documents was obtained by Bergstrom from a publication by Delphi Corporation which Moultanovsky included in a presentation to Bergstrom management while he was an employee of Bergstrom.  Thus, the information was not a trade secret at all and was certainly not any property of Bergstrom.

75.  Bergstrom has accused Moultanovsky of taking various Bergstrom materials with him when Moultanovsky left full time employment with Bergstrom.  However, Bergstrom knew or should have known that when he left full-time employment with Bergstrom, Moultanovsky was hired by Bergstrom as its sales representative for Eastern Europe and was instructed by Bergstrom's COO, Larry Bull, to take a Bergstrom computer with him to help Bergstrom in that regard.  Moultanovsky continued in this capacity even after the present litigation began.  Bergstrom has never to this day asked that Moultanovsky cease in that capacity and return the computer.

76.  Bergstrom knew or should have known that the claims it asserted against Moultanovsky were barred under the applicable statute of limitations.  Moultanovsky has and could have no liability

for those claims when they were finally brought by Bergstrom.

## ACC AND MOULTANOVSKY REQUEST THAT ALL ISSUES TRIABLE BY JURY BE SO TRIED IN THIS CASE.

**RELIEF SOUGHT:**

ACC and Moultanovsky request this Court enter Judgement against Bergstrom, declaring that:

A.  ACC does not infringe upon any of the issued patents,

B.  ACC is not a willful infringer even if its products did infringe upon those issued patents,

C.  ACC is not liable to Bergstrom for any damages on account of the issued patents,

D.  The issued patents were not validly issued to Bergstrom,

E.  The issued patents and any later patents based upon those disclosures are not enforceable by Bergstrom,

F.  The copyright registration was not validly issued to Bergstrom,

G.  The copyright registration is not enforceable by Bergstrom,

H.  Bergstrom has violated the antitrust laws of the United States and is liable to ACC for its damages arising therefrom,

I.  Bergstrom has committed unfair competition against ACC and is liable to ACC for its damages arising therefrom,

J.  Bergstrom has intentionally interfered with ACC and Moultanovsky's contractual relations

and is liable to ACC and Moultanovsky for their damages arising therefrom,

K.   Bergstrom has intentionally abused the legal process liable to Moultanovsky for his damages arising therefrom,

L.   This is an "exceptional case" within the meaning of the patent laws liable to ACC for its reasonable attorneys fees arising therefrom, and

M.   All such other relief as may be just and proper.


Dated: January 9, 2009                                    Respectfully submitted,

                                                          s/Ryan M. Fountain
                                                          _____
                                                          Ryan M. Fountain (#8544-71)
                                                          *RyanFountain@aol.com*
                                                          420 Lincoln Way West
                                                          Mishawaka, Indiana  46544
                                                          Telephone: (574) 258-9296
                                                          Telescope: (574) 256-5137


                                                          ATTORNEY FOR PLAINTIFFS


Certificate of Service

I certify that on January 9, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/EFC. system, which sent notification of such filing to all of the parties through at least the following counsel of record:

James R. Byron jrbyron@tglaw.us
Ryan M. Fountain RyanFountain@aol.com
Amy L. Lindner alindner@reinhartlaw.com
Paul J. Stockhausen pstockha@reinhartlaw.com
Edward A. Sullivan, III ed.sullivan@bakerd.com

                                                          s/Ryan M. Fountain
                                                          _____